

## NUMBER 13-16-00419-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

**INNOVATIVE BLOCK OF SOUTH
TEXAS, LTD.,**                                                                   **Appellant,**

**v.**

**VALLEY BUILDERS SUPPLY, INC.
D/B/A VALLEY BLOCK AND BRICK,**                                          **Appellee.**

**On appeal from the 430th District Court
of Hidalgo County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Contreras and Benavides
Memorandum Opinion by Justice Contreras**

We issued our original memorandum opinion in this cause on July 19, 2018. Appellant Innovative Block of South Texas, Ltd. (Innovative) has filed a motion for rehearing/en banc reconsideration. *See* TEX. R. APP. P. 49.1; 49.7. We deny the motion

for rehearing but withdraw our prior memorandum opinion and judgment and substitute the following memorandum opinion and accompanying judgment in their place.[1]

This is an appeal from a jury verdict awarding over two million dollars in damages in a business defamation suit. Innovative raises five issues contesting the judgment rendered in favor of appellee Valley Builders Supply, Inc. d/b/a Valley Block and Brick (Valley Block): (1) there was no evidence supporting the jury's finding of non-economic reputational damages; (2) Valley Block's reputational damages model "erroneously equated pecuniary harm with reputational damages"; (3) the testimony of Valley Block's expert witness was unreliable and invalid; (4) the statements at issue were not defamatory; and (5) *Casteel* error requires remand for a new trial. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 389 (Tex. 2000). We affirm.

## I. BACKGROUND

Both parties are companies engaged in the manufacturing and sale of concrete blocks for use in the construction industry. Valley Block, established in 1940, was the leading block manufacturer in the Rio Grande Valley until 2006, when Innovative opened a manufacturing plant in La Feria, Texas. In the next few years, Valley Block suffered financial difficulty, and it eventually shut down in 2010. In its live petition, Valley Block contended that representatives of Innovative caused Valley Block's demise by defaming and disparaging it on several occasions.[2]

Stephen Stange, a sales representative for a supplier of raw materials used for

---

[1] The motion for en banc reconsideration is dismissed as moot.

[2] Valley Block also sued Innovative Block Nevada, LLC (Innovative Nevada). Innovative Nevada was initially a party to this appeal, but it filed an unopposed motion to dismiss noting that the jury's findings and trial court's judgment do not pertain to it. We severed Innovative Nevada's appeal and dismissed that appeal pursuit to its motion. *See Innovative Block Nev., LLC v. Valley Builders Supply, Inc.*, No. 13-17-00311-CV, 2017 WL 2705036, at *1 (Tex. App.—Corpus Christi June 22, 2017, no pet.) (mem. op.).

block production, testified that he met with Ryan Murphy, Innovative's promoter and former president. According to Stange, Murphy told him that Innovative would not be competing directly with Valley Block because Innovative was "going to primarily get into the . . . paver business" and would be competing with firms that manufactured in Mexico.

According to Stange, Murphy showed him a photograph on his laptop and stated that "this is the kind of quality our competition is making." Stange was familiar with Valley Block's plant, however, and he recognized the photo as showing Valley Block's "cull pile," or collection of blocks that had manufacturing defects and were intended to be sold at a steep discount. Stange stated that every block manufacturer has a cull pile and so the existence of one at Valley Block's plant did not say anything about the quality of its products in general. Stange advised Murphy that the picture depicted Valley Block's cull pile, and Murphy "changed the slide."

Stange testified that he later met with John Sanchez, Innovative's sales manager, and that Sanchez told him: "[W]e are going to be so efficient and make such a good quality product at a lower cost that—that, you know, we'll put them out of business." According to Stange, Sanchez showed him the same picture of Valley Block's cull pile and claimed that "that is what their block looked like and they're making an inferior block and so on and so forth." When Stange corrected Sanchez, noting that Valley Block makes a "pretty good product," Sanchez "quit talking" and "flipped the page again."

Sanchez testified that he and Murphy were involved in setting up the La Feria plant. In daily meetings with potential customers, Sanchez learned that local masons "considered [Valley Block] as a standard here in south Texas" but that they wanted another supplier. Sanchez testified:

3

At the beginning we purchased a lot of product from Old Castle, which is a company out of Houston. We would purchase it and we would tell customers that that product was being built by us. So at the beginning, customers would say, "Well, this is a superior product. It was something different."

As I'm aware now, product in north Texas is cleaner, more refined. As you get lower to south Texas to these regions, there's a lot [of] sodium involved, a lot of aggregate or minerals in the product itself that won't enable you to produce that product that they look for up in north Texas.

So that was an initial startup for us to say, "Well, this is product that we're producing," when, in reality, we were having a lot of issues at the plant producing adequate product. So we would tell our customers, this is product that we're purchasing—I mean, that we're selling to you-all.

Sanchez testified that David Riegert became Innovative's president after Murphy, and that Riegert had an active role in planning Innovative's sales methods. Sanchez believed Riegert was on "a mission" to put Valley Block out of business in part because he was "desperate" to "guarantee" profits to Innovative's investors. According to Sanchez, Riegert told the sales team: "Okay. This is what we're going to do. You're going to go out and tell customers that this product is inferior[, t]hey're using bad aggregate, and that's how we're going to get customers." Sanchez opined that this strategy "worked to a certain point," though he agreed that he came to regret using dishonest sales tactics.

In a March 6, 2008 email to Riegert, Sanchez stated in part:

Danny [Luna, an Innovative sales representative] told a customer that Valley Block was using bad product and that they use bad materials. Danny says Meme [Lerma, another Innovative sales representative] told them that they were using bad materials. They both said you told them to tell the customers the truth. We can not be telling customers that Valley Block uses bad materials. We don't know if they do but we need to be careful.

Sanchez could not recall which customer was told by Luna that Valley Block was using bad materials. Sanchez said that Luna and other sales staff were willing to use these

4

tactics because they were told by Riegert that if they did not meet sales quotas, they would not get paid. According to Sanchez, Riegert initially denied telling Luna and Lerma to disparage Valley Block's products, but Riegert later said: "You know what, fine. I'm not going to do it again."

Sanchez stated that Innovative had an "internal lab" with a machine that could test block quality and strength. Innovative staff brought customers in to watch while Valley Block's products were tested—but they did not tell the customers that the blocks being tested were from Valley Block's cull pile, or, in some cases, from unrelated manufacturers in Mexico. Sanchez observed that "[s]ome customers were very loyal to [John] McCoy, [Valley Block's president]. So the only strategy to obtain those customers was, of course, come up with a strategy of making them believe that there was bad material within his product." Even so, several customers did not leave Valley Block until Innovative became their only option.

Sanchez identified an agenda for an Innovative sales meeting on March 6, 2008; among the items included in the agenda was "Bad product & materials from [Valley Block]" with "David" listed as the presenter. Sanchez also identified a letter dated June 28, 2008 which Riegert sent to Van-Tech, a customer, stating:

> Thank you for your telephone call regarding your recent purchase of pavers for your TXDOT project on 1 Mile East in Mercedes, TX. We are sorry to hear that the pavers lacked the quality you have come to expect from us. We strive to use better aggregates since our competition such as Pavestone and Valley Block use low quality aggregates to manufacture pavers.
>
> During our manufacturing process, added qualities are mixed into the selection of TXDOT pavers; high quality raw material is used and screened by our in-house testing lab to assure the highest quality and later tested by our in-house lab and Trinity labs to assure the required 8,000 PSI. In the case of your pavers, it appears that we were the victims of human or mechanical error, in that the system failed to add the appropriate measures to detect poor quality of pavers. Please be assured that we have reported

5

this incident to our quality assurance department and that they are implementing measures to ensure that this situation does not recur.

We are sorry that you were unable to proceed with your project as scheduled. We assure you that our products are backed-up by an unmatched manufactured [sic] warranty. We are committed to resolve this issue as soon as possible and support you to complete this project. We hope that you will give us another chance to provide you with the quality pavers you deserve and that all your future encounters with our pavers bring you nothing but satisfaction.

Sanchez testified that Innovative also sent letters like this to other customers. According to Sanchez, Innovative "did not have a clue" as to whether Valley Block was using "low quality aggregates" at the time the letters were sent; although Innovative did know that Valley Block was using aggregate that was not from south Texas.

Sanchez agreed that Valley Block was put out of business not only by false statements, but also by competition and Innovative's low prices. He stated that Riegert's strategy was to "lower the price regardless of what the cost was to manufacture the product" and that Innovative lost millions of dollars as a result. Sanchez was fired by Innovative in October 2009, but he denied that he was "making all this up" as a "disgruntled ex-employee."

Riegert testified that Innovative did not sell block for less than the cost of raw materials. Further, he denied that he told his salespeople to tell customers that Valley Block was using bad materials, and he could not recall ever stating that his goal was to put Valley Block out of business. Riegert testified that he had seen the March 2008 email from Sanchez and that he had written the June 2008 letter to Van-Tech. He conceded that, at his deposition, he testified that he never heard anyone at Innovative say that Valley Block was using bad aggregate; as to the Van-Tech letter, Riegert testified that he "didn't recall that memo at the time of the deposition." When asked whether Innovative

6

lost "roughly $12,250,000" in its first three years of operation, Riegert replied that "[i]t sounds accurate, yes."

Cynthia Hinojosa testified that she is a co-owner of Ram Masonry, which had been a customer of Valley Block and Innovative. Hinojosa stated that, when Innovative came into the market, its prices were cheaper than Valley Block, but it was not a big difference and it "varied from time to time." Later, she said that Innovative's prices were "always lower."

Hinojosa agreed with Valley Block's counsel that a "person from Innovative" once told her that Valley Block "had gotten a bad load of aggregate." She could not remember who the person was or whether the statement was made in person or over the phone. Hinojosa testified that she did not think Valley Block would knowingly use bad aggregate, but she could not afford to take the "risk" that it had done so unknowingly. When asked whether she "took Ram's business to Innovative" after the "person from Innovative" made that statement, Hinojosa replied: "Pretty much." She believed she would have "kept buying from Valley Block" if the "person from Innovative" never made that statement. However, she agreed that Innovative's lower prices "could have been part of the reason" that she switched to Innovative. An accountant testified that, based on records he reviewed, Valley Block lost $93,528 in profits due to its loss of Ram Masonry's business.

Hinojosa agreed that, at some point, she tried to "go back to Valley Block" because she was having "some problems" with the sizing and porousness of Innovative's products. However, she was not able to take her business back to Valley Block because "they didn't have as much business [as] they used to and they were already having time issues with production an[d] stuff." She stated that Valley Block was not able to promise that they

7

would provide block by a certain date. She agreed that, at that time, she was "willing to go with Valley Block . . . but couldn't because they couldn't timely supply the product." Hinojosa stated that, even if there had previously been a risk that Valley Block was unknowingly using bad aggregate, that was no longer a concern because "a load of aggregate will only last a month, a few months," and "the bad aggregate" was only "mentioned" that one time.

Kenneth Lehrer, a forensic economist, testified as an expert on Valley Block's behalf. He stated that he was asked to "estimate, as best possible, the general damages that came about to Valley [Block] by the loss of reputation through statements of others." Lehrer stated that, for purposes of his analysis, he assumed that "many things" contributed to Valley Block's demise, including "the economy of the United States, the economy of Texas, the economy of the Valley, the weather, the people, and the statements" at issue in this case. He acknowledged that, according to documents he reviewed, Innovative sold their products at lower prices and lost roughly $14 million between 2007 and 2010.

Lehrer stated that reputational damages cannot be calculated precisely, but rather, "[y]ou have to take a range, because there's too many variables, and some of these variables you'll never know." Accordingly, in order to estimate reputational damages, Lehrer used a "quasi-Monte Carlo" method. He stated that the underlying theory of a "Monte Carlo"-type analysis is "doing something millions of times to come up with the most probable outcome," and that such an approach is appropriate in "[a]reas where there's a large amount of data" and "you can't reach a generally accepted answer, but you want to use all of the data." According to Lehrer, "quasi-Monte Carlo" method "uses

the Monte Carlo techniques, but on a small basis."

Lehrer explained that, to calculate his estimate, he began with a figure of $5,153,000, representing Valley Block's total losses between 2007 and 2015,[3] and he then performed the quasi-Monte Carlo analysis to estimate the dollar amount of the losses that were attributable to reputational damages. As part of that analysis, Lehrer posited four "scenarios"—i.e., four different figures representing possible percentages of the total losses attributable to reputation damages—and he ascribed a percentage likelihood to each scenario. He did this twice; once for a "low-end" estimate and once for a "high-end" estimate. For the "low-end" estimate, Lehrer used scenarios under which reputation damages constituted 15, 20, 35, and 50 percent of Valley Block's total losses. He ascribed likelihoods of 20, 32, 30, and 18 percent to the four scenarios, respectively, resulting in a "low-end" estimate of $1,489,200 in reputation damages. For the "high-end" estimate, Lehrer's four scenarios posited that reputation damages constituted 15, 20, 40, and 60 percent of Valley Block's total losses. Again, he ascribed likelihoods of 20, 32, 30, and 18 percent to the four scenarios, respectively. This resulted in a "high-end" estimate of $1,659,300 in reputation damages. His final estimates were apparently rounded up from these figures. A detailed written report summarizing his findings was entered into evidence.

Lehrer did not explain, in his testimony or his written report, how he decided on the percentage figures used for the eight scenarios, except to say that that he did not use a scenario under which reputation damages constituted more than sixty percent of Valley

---

[3] For 2007, 2008, and 2009, Valley Block's tax returns showed losses totaling $4,917,000. For 2010 to 2015, Lehrer "took the projected income that they should have made of $27,700 in 2009 to [$]30,000 in 2010 . . . and grew it at ten percent a year," resulting in a projected loss of $200,000 for those six years.

Block's total losses because "we had so many other factors" such as the recession, competition, and weather. He concluded that the amount of reputation damages suffered by Valley Block as a result of defamation was "most probably between $1,500,000 and $1,660,000."[4]

After hearing all of the evidence, the jury found that Innovative published the following statements: (1) "That is what their block looked like and they're making an inferior block"; (2) "Valley Block was producing bad product and they use bad materials"; (3) "Valley Block uses low quality aggregates to manufacture pavers"; and (4) "Valley Block received a load of bad aggregate." The jury further found that the statements were false and defamatory per se, that Innovative knew or should have known in the exercise of ordinary care that they were false and potentially defamatory, and that $1.8 million would fairly and reasonably compensate Valley Block for injury to its reputation caused by these statements in the past. The jury additionally found that the fourth listed statement was defamatory per quod and it awarded $93,528 in damages for "actual pecuniary lost profits" resulting from that statement alone. Finally, the jury found that the damage to Valley Block resulted from Innovative's malice, and it awarded $10 million in exemplary damages.

The trial court rendered judgment awarding $1,803,528 in compensatory

---

[4] Lehrer testified that his estimate covered 2007 through 2015 and, therefore, it included the $93,528 in lost profits attributable to the loss of Ram Masonry's business. Innovative does not contend on appeal that the award of both reputational and lost profits damages constituted an impermissible double recovery, though it does argue by its second issue that the damages model testified to by Lehrer "erroneously equated pecuniary harm with reputational damages."

10

damages,[5] $326,117.39 in pre-judgment interest, and exemplary damages of $937,056.[6]

This appeal followed.

## II. DISCUSSION

### A.    Defamatory Nature of Statements

We first address Innovative's fourth issue on appeal, by which it contends that, as

a matter of law, none of the four statements listed in the jury charge were defamatory.

#### 1.    Applicable Law and Standard of Review

A statement is defamatory if it tends to injure one's reputation, exposing one to

public hatred, contempt, or ridicule, or financial injury, or to impeach any person's

honesty, integrity, virtue, or reputation. *Montemayor v. Ortiz*, 208 S.W.3d 627, 651 (Tex.

App.—Corpus Christi 2006, pet. denied); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 73.001

(West, Westlaw through 2017 1st C.S.) (defining libel). It is well settled that corporations,

like people, have reputations and may recover for harm inflicted on them. *Waste Mgmt.*

*of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 149 (Tex. 2014).

Defamatory statements may be either defamatory per se or defamatory per quod.

A defamatory written statement is libel per se if the words in and of themselves are so

obviously hurtful to the person aggrieved by them that they require no proof of injury.

*Main v. Royall*, 348 S.W.3d 381, 390 (Tex. App.—Dallas 2011, no pet.). These include

---

[5] The judgment states that this amount represents $1.8 million in reputational damages plus $93,528 in lost profits, less a $90,000 settlement credit. According to a letter from Valley Block's counsel to the trial court which appears in the appellate record, this credit was included due to the parties' prior settlement of Valley Block's claim for tortious interference with prospective business relations.

[6] The exemplary damages award was capped at two times the amount of lost profits plus $750,000. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(b) (West, Westlaw through 2017 1st C.S.) ("Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of: (1) (A) two times the amount of economic damages; plus (B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or (2) $200,000.").

statements that unambiguously charge a crime, dishonesty, fraud, rascality, or general depravity, and falsehoods that injure one in his office, business, profession, or occupation. *Id.* An oral statement is defamatory per se if it falls within one of four categories: (1) imputation of the commission of a crime; (2) imputation of a loathsome disease; (3) injury to a person's office, business, profession, or calling; or (4) imputation of sexual misconduct. *Minyard Food Stores, Inc. v. Goodman*, 50 S.W.3d 131, 140 (Tex. App.—Fort Worth 2001), *rev'd on other grounds*, 80 S.W.3d 573 (Tex. 2002). If a statement is defamatory per se, no independent proof of damage to the plaintiff's reputation is required, as the defamation itself gives rise to a presumption of general damages. *Bentley v. Bunton*, 94 S.W.3d 561, 604 (Tex. 2003).

The issue of whether statements are defamatory per se is generally a matter of law to be decided by the court. *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 581 (Tex. App.—Austin 2007, pet. denied). The court may, however, pass the inquiry to the jury if it determines that an ambiguity exists about the meaning and effect of the words or that a predicate fact question remains about whether the statements were published or were false. *Id.* (citing *Musser v. Smith Protective Serv., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987)). Whether a statement is rhetorical hyperbole, opinion, or an actionable assertion of fact is a question of law for the court. *Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex. 1989).

### 2. Analysis

Innovative argues that the statements were not defamatory as a matter of law because they were non-actionable hyperbole and because they were not false. "'Rhetorical hyperbole' is extravagant exaggeration employed for rhetorical effect." *Am.*

12

*Broad. Cos. v. Gill*, 6 S.W.3d 19, 30 (Tex. App.—San Antonio 1999, pet. denied), *disapproved of on other grounds by Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex. 2000). Because rhetorical hyperbole is not subject to objective verification, it is not provable as false and is therefore not actionable. *Id.* (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20 (1990)). Statements of opinion are likewise not actionable under Texas law. *Id.* (citing *Carr*, 776 S.W.2d at 570).

Trial evidence showed that the first statement—"That is what their block looked like and they're making an inferior block"—was made by Innovative representatives Murphy and Sanchez to Stange after they showed him what they claimed was a picture of Valley Block's products. The jury found this statement to be defamatory per se and false. We cannot conclude, as Innovative urges, that those findings are incorrect as a matter of law. Stange testified that the picture shown to him by Murphy and Sanchez was of Valley Block's cull pile—i.e., defective products which were intentionally set aside and not intended for public sale—and therefore did not represent the typical quality of Valley Block's products. The statement that the cull pile *did* in fact represent Valley Block's typical product quality plainly tended to injure Valley Block's reputation in its business as a block manufacturer. *See Minyard Food Stores, Inc.*, 50 S.W.3d at 140.

Innovative focuses on the use of the word "inferior" in this statement, and it notes that the Texas Supreme Court recently recognized that merely calling a competitor's product "inferior" is "not strictly speaking defamatory in the sense of dignitary harm." *See In re Lipsky*, 460 S.W.3d 579, 591 n.10 (Tex. 2015) (orig. proceeding). But Murphy and Sanchez did not merely describe Valley Block's products as inferior; they also showed Stange a picture of the cull pile and suggested that it was typical of Valley Block's product

13

quality. Unlike a bare declaration of inferiority, this was an objectively verifiable assertion of fact that was actionable as defamation per se.

Similarly, as to the fourth statement listed in the jury charge—"Valley Block received a load of bad aggregate"—Hinojosa testified that she understood the statement to mean that there was a risk that Valley Block inadvertently obtained a "bad load of aggregate," and she would not have moved her business to Innovative if the statement had not been made. Again, although describing a competitor's product in generally negative terms can often be mere hyperbole, this particular statement carried the additional implication of an objectively verifiable fact—i.e., that Valley Block received a supply of defective raw materials. Thus, considering the context, we conclude that a reasonable person would have found the statements to be injurious to Valley Block's reputation in its business as a block manufacturer. *See Bentley*, 94 S.W.3d at 579 ("[T]he meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements."). The same reasoning applies to the second and third statements listed in the jury charge—"Valley Block was producing bad product and they use bad materials" and "Valley Block uses low quality aggregates to manufacture pavers." *See Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 631 (Tex. App.—Fort Worth 2007, pet. denied) (holding that "built with sub-standard materials" is not a non-actionable assertion of opinion because "[t]he types of materials [defendant] uses, as well as their quality and durability when compared to the materials used by [plaintiff] and other manufacturers, are facts that can be verified").

14

Innovative further contends that the statement made to Hinojosa was not false because Sanchez testified that the aggregate used by Innovative, which was from north Texas, was "cleaner" and "more refined" than the aggregate used by Valley Block. However, truth is an affirmative defense to a defamation action involving a private plaintiff, and Innovative therefore bore the burden to establish truth at trial. *See Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). Innovative has not shown that the trial evidence conclusively establishes the truth of the statement as a matter of law. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) ("When a party challenges the sufficiency of the evidence supporting an adverse finding on an issue on which it has the burden of proof, that party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue."). Instead, the jury, as the trier of fact, was entitled to disbelieve Sanchez's testimony regarding the relative quality of the aggregate used by Valley Block and Innovative. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

Innovative's fourth issue is overruled.

## B.    Existence of Reputational Damages

Innovative's first issue argues that there was no evidence that Valley Block suffered reputational damages. In particular, it contends that there was no evidence that the people who heard the allegedly defamatory statements believed those statements or that their perception of Valley Block changed because of the statements. *See Brady v. Klentzman*, 515 S.W.3d 878, 887 (Tex. 2017) ("Showing that the community was aware of and discussed the defamatory statements is not enough; there must be evidence that people believed the statements and the plaintiff's reputation was actually affected.");

15

*Hancock v. Variyam*, 400 S.W.3d 59, 71 (Tex. 2013) ("[L]oss of reputation for defamation is concerned with a recipient believing the statement. If every recipient discredits the statement, no loss of reputation has occurred.").

The jury in this case found all four statements set forth in the jury charge to be defamatory per se, and we have already upheld that determination. When a statement is defamatory per se, nominal damages may be awarded without proof of actual injury because mental anguish and loss of reputation are presumed. *In re Lipsky*, 460 S.W.3d at 596; *Bentley*, 94 S.W.3d at 579. In this manner, the plaintiff can vindicate his or her name and obtain nominal damages without evidence of actual injury. *See In re Lipsky*, 460 S.W.3d at 596 (noting that "actual damage is not an essential element of [a defamation per se] claim").

Innovative's argument regarding the lack of evidence showing people believed the defamatory statements pertains only to the *existence* (as opposed to the *amount*) of reputational damages—but the existence of such damages is presumed when a statement is defamatory per se. *See id.*; *Bentley*, 94 S.W.3d at 579. Therefore, we overrule Innovative's first issue.

## C.    Amount of Reputational Damages

By its second and third issues, Innovative argues that there was no evidence of the amount of reputational damages. The only evidence of the amount of reputational damages in this case was presented by Lehrer, Valley Block's expert witness. Innovative does not dispute Lehrer's credentials as an expert. Instead, it argues on appeal that his testimony regarding the amount of reputational damages suffered by Valley Block was "unreliable, unsupported, irrelevant, speculative, and inadmissible."

16

### 1. Applicable Law and Standard of Review

In reviewing a "no-evidence" challenge to a jury finding, the ultimate test is whether the evidence would enable reasonable and fair-minded people to make the finding. *City of Keller*, 168 S.W.3d at 827. Evidence will be legally insufficient to support the finding if the record reveals: (1) the complete absence of evidence of a vital fact; (2) that the court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a scintilla; or (4) that the evidence establishes conclusively the opposite of a vital fact. *Id.* at 810. Evidence is more than a scintilla if it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011). Evidence is less than a scintilla is if it is "so weak as to do no more than create a mere surmise or suspicion that the fact exists." *Regal Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 603 (Tex. 2010). We view the evidence in the light most favorable to the finding, and we assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it. *City of Keller*, 168 S.W.3d at 819. We defer to the jury's determination as to the credibility of the witnesses and the weight to give their testimony, and we indulge every reasonable inference in support of the finding. *Id.* at 819, 822.

Although the existence of reputational damages is presumed in cases of defamation per se, any amount of damages beyond a nominal sum must be supported by sufficient evidence at trial. *See Brady*, 515 S.W.3d at 886 (citing *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014); *Hancock*, 400 S.W.3d at 68); *In re Lipsky*, 460 S.W.3d at 596*.* Compensatory damages in defamation cases must compensate for "actual

17

injuries" and cannot merely be "a disguised disapproval of the defendant." *Brady*, 515 S.W.3d at 887 (citing *Burbage*, 447 S.W.3d at 259). But when the damages are for non-economic losses, such as lost reputation, the jury must be given some latitude because these general damages are, by their nature, incapable of precise mathematical measure. *Id.* (citing *Waste Mgmt. of Tex.*, 434 S.W.3d at 159–60). Even so, evidence of loss of reputation should be more than theoretical. *Id.* (citing *Burbage*, 447 S.W.3d at 261).

A qualified expert witness "may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. To be admissible, expert testimony must be based on sound reasoning and methodology. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009) (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997)). We review a trial court's decision to admit expert testimony for an abuse of discretion. *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870. But although expert opinion testimony often provides valuable evidence in a case, "it is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law." *Coastal Transp. Co. v. Crown Cent. Petrol. Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (citing *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999)). In other words, "a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." *Id.*

### 2. Lehrer's Testimony

As noted, Lehrer concluded that the amount of reputational damages suffered by Valley Block as a result of Innovative's defamatory statements was "most probably" between $1,500,000 and $1,660,000. To arrive at this conclusion, he first calculated the

total amount of losses suffered by Valley Block between 2007 and 2015.  Innovative does not dispute the accuracy of Lehrer's calculation of this figure, which he stated was $5,153,000.  Lehrer then sought to estimate what percentage of those losses were attributable to the defamatory statements.  He proposed eight "scenarios," or percentage figures—four for a "low-end" estimate and four for a "high-end" estimate—which he stated could represent the percentage of the total losses attributable to reputational damages caused by the defamatory statements.  He then multiplied the amount of total losses by each percentage figure to generate a dollar amount of the total losses attributable to defamation under each scenario:

Low-End Estimate

|  | Percentage of total losses attributable to defamation | Total losses | Dollar amount of losses attributable to defamation |
|---|---|---|---|
| Scenario A | 15% | $5,153,000 | $772,950 |
| Scenario B | 20% | $5,153,000 | $1,030,600 |
| Scenario C | 35% | $5,153,000 | $1,803,550 |
| Scenario D | 50% | $5,153,000 | $2,576,500 |

High-End Estimate

|  | Percentage of total losses attributable to defamation | Total losses | Dollar amount of losses attributable to defamation |
|---|---|---|---|
| Scenario A | 15% | $5,153,000 | $772,950 |
| Scenario B | 20% | $5,153,000 | $1,030,600 |
| Scenario C | 40% | $5,153,000 | $2,061,200 |
| Scenario D | 60% | $5,153,000 | $3,091,800 |

Lehrer also developed a percentage likelihood for each scenario, which together necessarily totaled 100% for each estimate.  Using the eight "scenarios" and their percentage likelihoods as inputs, Lehrer performed a "quasi-Monte Carlo" analysis to arrive at the two final estimates.  This entailed simply multiplying the eight dollar-amount scenarios by their respective likelihoods, then adding the results, and rounding up:

| | Dollar amount of losses attributable to defamation | Percentage likelihood of each scenario | Defamation losses multiplied by percentage likelihood |
|---|---|---|---|
| Scenario A | $772,950 | 20% | $154,590 |
| Scenario B | $1,030,600 | 32% | $329,792 |
| Scenario C | $1,803,550 | 30% | $541,065 |
| Scenario D | $2,576,500 | 18% | $463,770 |
| | | Sum: | $1,489,217 |
| | | Low-End Estimate: | $1,500,000 |

High-End Estimate

| | Dollar amount of losses attributable to defamation | Percentage likelihood of each scenario | Defamation losses multiplied by percentage likelihood |
|---|---|---|---|
| Scenario A | $772,950 | 20% | $154,590 |
| Scenario B | $1,030,600 | 32% | $329,792 |
| Scenario C | $2,061,200 | 30% | $618,360 |
| Scenario D | $3,091,800 | 18% | $556,524 |
| | | Sum: | $1,659,266 |
| | | High-End Estimate: | $1,660,000 |

### 3.  Analysis

By its third issue, Innovative argues that Lehrer's "quasi-Monte Carlo" analysis cannot support the jury's verdict because his methodology is "untested, unreliable, and invalid."  It notes that there appear to be no cases using a Monte Carlo method or anything similar to determine reputational damages, while Valley Block counters that Monte Carlo analyses have been approved by courts in other contexts.  *See, e.g., Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 294 (5th Cir. 2010) (finding admissible expert testimony using a Monte Carlo analysis to calculate the volume of the defendant's waste dumped at Turtle Bayou).

We disagree that Lehrer's statistical methodology was invalid or unreliable.  The Fifth Circuit's *Lyondell* opinion is instructive in this regard.  The question there was how

many gallons of waste were improperly deposited by the defendant at Turtle Bayou. *Id.*

The trial court appointed an environmental engineer as an expert and tasked him with

determining that figure so that remediation costs could be properly allocated. *Id.* at 291–

92. In discussing whether the expert's Monte Carlo analysis was admissible under

*Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993), the court explained as

follows:

> Monte Carlo measures the probability of various outcomes, within the bounds of input variables; to calculate [defendant's] waste volume, for example, [the expert] used the district court's three volume estimates as inputs. Instead of simply averaging the input values, Monte Carlo analysis uses randomly-generated data points to increase accuracy, and then looks to the results that those data points generate. The methodology is particularly useful when reaching an exact numerical result is impossible or infeasible and the data provide a known range—a minimum and a maximum, for example—but leave the exact answer uncertain. Seventy years after its discovery by physicists involved with nuclear weapons research, Monte Carlo analysis is now at home not only in the physical sciences but in a wide variety of fields including, for instance, the world of high finance.

*Lyondell*, 608 F.3d at 293. The court noted that Monte Carlo is a generally-accepted

method of statistical analysis in general, and it did not matter that the method had not

previously been used in the specific context of determining waste volume. *Id.*

("[Defendant] incorrectly assumes that the use of Monte Carlo analysis in this case differs

meaningfully from any other Monte Carlo application; once we remove the irrelevant label

of 'waste volume,' the court's chosen inputs serve as any other three numbers would.").

Moreover,

> just because a Monte Carlo simulation produces a range of outcomes, rather than one single numerical value, does not mean it is speculative. If anything, Monte Carlo analysis provides greater certainty than the basic alternatives: using one of the three data points or using the arithmetic average of all three.

*Id.* at 294. Accordingly, the court rejected the defendant's arguments against the reliability of the methodology and found that the expert testimony was properly admitted under *Daubert*. *See id.* at 293–94.

Innovative is correct that the issue in *Lyondell* had nothing to do with reputational damages and that Lehrer's methodology was not a "pure" Monte Carlo analysis. But these discrepancies do not affect the probative value of Lehrer's testimony. Lehrer's method, if anything, was simpler and more straightforward than the one used in *Lyondell*; in fact, despite Lehrer's testimony, his analysis appears to be more akin to a simple weighted average than a Monte Carlo-type study. In any event, as in *Lyondell*, the testimony is relevant, probative, and admissible because it "supports choosing one result over another, and certainly assisted the [trier of fact] in its decisionmaking." *Id.* at 294.

Innovative further contends by its third issue that the figures Lehrer used as inputs—i.e., the eight "scenarios" and their percentage likelihoods—"had no apparent connection to any data." In other words, Innovative argues that Lehrer's inputs constitute nothing more than his *ipse dixit* and therefore, his estimates are not probative and cannot support the judgment.

Of course, in order for the results of a statistical analysis to have evidentiary value, the analysis must begin with probative and reliable inputs. *See id.* (noting that "Monte Carlo analysis is unreliable when injected with faulty inputs") (citing *In re Application of Erie Blvd. Hydropower, L.P. v. Town of Ephratah Bd. of Assessors*, No. 17-1-2000-0331, 2003 WL 21172636, at *4 (N.Y. Sup. Ct. Apr. 11, 2003) ("The accuracy of these opinions of value is dependent upon the data from which they were derived. . . . [A]ll you are doing in a Monte Carlo simulation is coming back to your own assumptions, so whatever went

22

in comes out. Stated differently, if you make bad assumptions, you obtain bad output.")).

For example, in *Lyondell*, the three input values used in the expert's Monte Carlo analysis were explicitly derived from previously-admitted evidence. *See id.* at 292. The trial court itself crafted the input values—a minimum, an intermediate, and a maximum. *See id.* The minimum value—4,200 gallons—was derived from witness testimony that two 2,100-gallon truckloads of defendant's waste were delivered to Turtle Bayou. *Id.* The intermediate value—74,350 gallons—was derived from documentary evidence showing that 297,400 gallons of the defendant's waste were shipped to a disposal site on Highway 90, along with witness testimony that 25% of the waste bound for the Highway 90 site ended up in Turtle Bayou. *Id.* The maximum value—127,176 gallons—was derived from documentary evidence from a disposal company showing that 508,704 gallons of defendant's waste were shipped to the Highway 90 site. *Id.* The expert witness used these three input values to calculate the volume of the defendant's waste disposed of at Turtle Bayou. *Id.*

We conclude that, as in *Lyondell*, the figures Lehrer used as inputs were indeed probative and sufficient to support the verdict. Again, although Lehrer did not testify in great detail as to how he came up with each of the eight "scenarios" and their percentage likelihoods, he did explain that no more than sixty percent of Valley Block's losses could have been attributable to loss of reputation caused by defamation because there were "other factors" involved in the company's failure, including the recession, the weather, and Innovative's lower-priced competition. In his analysis, Lehrer posited scenarios ranging from 15% to 60%—therefore, the essence of his testimony was that the amount of reputational damages suffered by Valley Block was within this range. This range is

23

wide, but the amount of reputational damages is, "by its nature, incapable of precise mathematical measure." *Brady*, 515 S.W.3d at 887. And even though the jury's award of $1.8 million was more than Lehrer's "high-end" estimate, it was less than the maximum amount supported by the largest of his eight proposed scenarios. Accordingly, we conclude that Lehrer's testimony constituted more than a scintilla of evidence to support the jury's reputational damages award.

Finally, Innovative contends by its second issue that Lehrer's estimates constituted "no evidence" because he "erroneously equated pecuniary harm with reputational harm." It argues that economic damages resulting from defamatory statements can only be recovered via a business disparagement cause of action.[7] Again, we disagree. In *Waste Management*, the Texas Supreme Court found insufficient evidence to support the jury's $5 million reputational damages award where the plaintiff's chief executive estimated that the plaintiff's reputation was worth "in the range of $10 million." 434 S.W.3d at 160. But the executive's estimate was not supported by the documentary evidence, and there was nothing else in the record that "quantif[ied] any amount of reputational damages." *Id.* The

---

[7] In *In re Lipsky*, the Texas Supreme Court explained:

Business disparagement and defamation are similar in that both involve harm from the publication of false information. The respective torts, however, serve different interests. Whereas defamation actions chiefly serve to protect the personal reputation of an injured party, a business disparagement claim protects economic interests. Business disparagement or injurious falsehood applies to derogatory publications about the plaintiff's economic or commercial interests. The tort does not seek to redress dignitary harms to the business owner, but rather redresses aspersions cast on the business's commercial product or activity that diminishes those interests.

A corporation or other business entity that asserts a claim for defamation may assert an additional or alternative claim for business disparagement if it seeks to recover economic damages for injury to the business. Impugning one's reputation is possible without disparaging its commercial interests and vice versa. Depending on the circumstances, then, a plaintiff may have a claim for defamation, or for business disparagement, or both.

460 S.W.3d 579, 591 (Tex. 2015) (cleaned up). Valley Block asserted a claim of business disparagement in its live petition, but the claim was non-suited prior to the conclusion of trial.

evidence did not show that $5 million would fairly and reasonably compensate the plaintiff; therefore, the plaintiff was entitled to only nominal damages. *See id.* at 160–61 ("The evidence must support the amount awarded by the jury; it must not be an 'indicator' that supports the estimates offered by the corporate executive."). The Texas Supreme Court also found insufficient evidence to support actual reputational damages in *Burbage*, where the plaintiff testified as follows about the value of his funeral home business: "I don't really know. I'd say a few million dollars." 447 S.W.3d at 260. There was no evidence that the business suffered an actual loss or "even the funeral home's actual value." *Id.* at 262. *Waste Management* and *Burbage* involved only business defamation claims—not business disparagement—and yet the supreme court did not state in those cases that evidence of pecuniary harm may not be used to estimate the amount of reputational damages.

Here, Lehrer's testimony established the total amount of losses suffered by Valley Block and gave the jury a range of possible values for the amount of reputational damages suffered as a result of defamation. His testimony gave the jury a basis upon which it could conclude that the damage to the company's reputation accounted for a significant percentage of those losses. This exceeds the evidence adduced in *Waste Management* and *Burbage*. We recognize that there is a difference between pecuniary harm and reputational damages, but in this case, where the victim of defamation is a business that is no longer an ongoing concern, we believe that evidence of the former is relevant and probative to the jury's determination as to the latter—emphasizing, again, that the assessment of reputational damages is an inexact science. *See Brady*, 515 S.W.3d at 887.

25

For the foregoing reasons, we overrule Innovative's second and third issues.

## D.    *Casteel* Error

By its fifth issue, Innovative contends that the submission of broad-form jury charge questions as to reputational damages and malice was error under *Casteel* because the questions commingled valid and invalid liability theories.  *See Casteel*, 22 S.W.3d at 389 ("When a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding.").[8]  This issue hinges on Innovative's contention that at least one of the four statements listed in the jury charge was not defamatory per se as a matter of law.  We have already rejected this contention.  *See supra* section II.A.  Therefore, the

---

[8] Responding to Innovative's fifth issue, Valley Block argues that any *Casteel* error is waived because, although Innovative objected at the charge conference to the submission of the individual statements, it did not object to the submission of the broad-form reputational damages or malice questions. *See* TEX. R. APP. P. 33.1; TEX. R. CIV. P. 274 ("Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections."); *Memon v. Shaikh*, 401 S.W.3d 407, 417 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (holding in defamation case that, even if each statement listed in the jury charge was considered a "separate liability theory," and even if two of those statements lacked evidentiary support, the appellant did not preserve *Casteel* error because he "failed to object to the damages question"), *judgm't withdrawn w.r.m.*, No. 14-12-00015-CV, 2014 WL 6679562 (Tex. App.—Houston [14th Dist.] Nov. 25, 2014) (mem. op. per curiam); *Wackenhut Corr. Corp. v. de la Rosa*, 305 S.W.3d 594, 619–21, n.26 (Tex. App.—Corpus Christi 2009, no pet.) (holding that, when a broad-form damages question allows the jury to base its award on both valid and invalid grounds, the award may not be disturbed on appeal if the defendant did not object to the broad-form question on the basis that the jury may have based its award on an improper ground), *abrogated on other grounds by Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 151 (Tex. 2015); *but see McFarland v. Boisseau*, 365 S.W.3d 449, 454–55 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (holding that, "once a party objects to the inclusion of invalid bases for liability in the charge, this objection also preserves error for any impact the wrongful inclusion has on other charge questions").

Valley Block additionally argues in its responsive brief that we "need not consider any possible *Casteel* issue" regarding the jury's malice finding because that finding is relevant only as to the exemplary damages award but "neither malice nor exemplary damages is at issue in the appeal" because "the parties have settled the exemplary damages award."  In its reply brief, Innovative acknowledges that "the settlement fully resolved the exemplary damages award" and states that "Innovative will confine its briefing to the broad-form reputational damages question without addressing the broad-form malice question."

For purposes of this opinion, we assume but do not decide that the issue has been preserved.

broad-form liability question in this case did not commingle valid and invalid liability theories, and there is no *Casteel* issue. *See id.* We overrule Innovative's fifth issue.

### III. Conclusion

The trial court's judgment is affirmed.

DORI CONTRERAS<br>
Justice

Delivered and filed the 15th
day of November, 2018.